# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

MARSHALL H. RUSSELL   )
         )
   **Plaintiff,**   )
         )  **Civil Action No. 1:05-0033**
 **v.**        )  **Judge Nixon / Knowles**
         )
JO ANNE BARNHART,   )
Commissioner of Social Security )
         )
   **Defendant.**   )

## REPORT AND RECOMMENDATION

   This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on "Plaintiff's Motion for Judgment." Docket Entry No. 19-1. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 21. Plaintiff has filed a Reply. Docket Entry No. 22.

   For the reasons stated below, the undersigned recommends that "Plaintiff's Motion for Judgment" be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

## I.  INTRODUCTION

Plaintiff filed his application for Supplemental Security Income ("SSI") benefits on June 3, 2002, alleging that he had been disabled since July 2, 1991, due to a brain tumor in remission, weakness, fatigue, and a learning disability.[1]  *See, e.g.,* Docket Entry No. 11, Attachment ("TR"), pp. 66, 281-83.  Plaintiff's application was denied both initially (TR 286-88) and upon reconsideration (TR 291-92).  Plaintiff subsequently requested (TR 28-29) and received (TR 37-45) a hearing.  Plaintiff's hearing was conducted on June 15, 2004, by Administrative Law Judge ("ALJ") Linda G. Roberts.  TR 293-337.  Plaintiff and Vocational Expert, Rebecca Williams, appeared and testified.  TR 297-307, 322-36.  Plaintiff's mother, Josephine Russell, also appeared and testified.  TR 307-22.

On November 12, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 10-21.  Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the non-disability requirements for Childhood Disability Benefits set forth in Section 202(d) of the Social Security Act (with the exceptions noted in 20 CFR § 404.352(b)(2)).
>
> 2. The claimant has not engaged in substantial gainful activity during the relevant period.
>
> 3. The claimant's remote history of medulloblastoma and is [*sic*] status-post craniotomy with radiation therapy organic mental disorders are considered "severe" in combination based on the requirements in the Regulations 20 CFR §§

---

[1]Additionally, on November 15, 2002, after the death of his father, Plaintiff filed an application for Child's Insurance Benefits - Survivor Claim.  TR 55.  In that application, Plaintiff alleged a disability date of July 19, 1991.  *Id.*  Plaintiff's application for Child's Insurance Benefits - Survivor Claim was denied on December 30, 2002.  *See* TR 26-27.

2

404.1520(c) and 416.920(b).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4, nor does the claimant.

5.    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the following residual functional capacity: to perform work 8 hours per day; but he would need to be seated.  He could stand/walk for 5 to 10 minutes per hour and to ambulate to/from his work area several times per day without difficulty.  Further, the claimant could lift, push, or pull about 5 pounds occasionally. Additionally, the claimant is capable of understanding, remembering, and carryout [*sic*] simple verbal instructions; to pay attention and concentrate for tasks presented; however, initiative and persistence are limited.  He is capable recognizing [*sic*] and avoiding obvious environmental hazards.

7.    The claimant has no past relevant work (20 CFR §§ 404.1565 and 416.965).

8.    The claimant is a 'younger individual between the ages of 18 and 44' (20 CFR §§ 404.1563 and 416.963).[2]

9.    The claimant has 'a high school education' (20 CFR §§ 404.1564 and 416.964).

10.   The claimant has the residual functional capacity to perform a range of sedentary work (20 CFR §§ 404.1567 and 416.967).

11.   Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of

---

[2]At the time of the hearing in 2004, Plaintiff was 20 years old.  TR 297.

3

such jobs include work as an unskilled assembler (1,000 in
the region and 60,000 in the national economy); an
inspector (300/12,000); and a general laborer (700/34,000).

12.     The claimant was not under a "disability," as defined in the
        Social Security Act, at any time through the date of this
        decision (20 CFR §§ 404.1520(g) and 416.920(g)).

TR 20-21 (footnote added).

On January 1, 2005, Plaintiff timely filed a request for review of the hearing decision.

TR 8.  On February 25, 2005, the Appeals Council issued a letter declining to review the case

(TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).

If the Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to a brain tumor in remission,[3] weakness, fatigue, and a

learning disability.[4]  *See* TR 66.

Thomas J. Boll, Ph.D., conducted Plaintiff's first neuropsychological examination on

February 19, 1992, at the University of Alabama, Birmingham.  Plaintiff's examination revealed

in part as follows:

Formal examination reveals a young man with overall I.Q. scores
in the low average range (VIQ 88, PIQ 84, FSIQ 85).  His

_____

[3]Plaintiff, in his Brief, notes that "his disability does not result from the tumor, but rather
from the side effects of the cure."  Docket Entry No. 19-2.

[4]The Administrative Record also contains Plaintiff's school records.  TR 96-109, 112-51.

4

academic achievement levels, however, are substantially lower with standard scores as follows: reading 63, spelling 67 and arithmetic 76. These suggest that he is lagging well behind expectation for a young man currently in the 2nd grade and is not only failing to demonstrate good benefit from past instructional activities but is at risk with regard to his current ability to maintain acceptable progress given the low level of his academic achievement thus far. Language examination also reveals difficulties including dysnomia, visual spatial immaturity and auditory discrimination difficulties, once again, suggesting that this young man is likely to have difficulties in a wide variety of academic pursuits and will require an Individual Educational Program to be established and maintained for him at this time.

Sensory perceptual examination reveals a relatively consistent pattern of right tactile suppressions although some right left confusion was also seen. Finger agnosia and astereognostic difficulties were substantially worse on the right than the left. Motor examination also revealed reduced speed, strength and coordination on the right side of the body even taking into account this young man's reported left-handedness. Fine motor steadiness and control was particularly poorly managed.

Measures of complex problem solving requiring neither speed nor motor coordination nor language were managed very well suggesting that Russell does have good basic problem solving skills and capacity to grasp the essential nature of new and unfamiliar situations when given enough time.

The results of this examination suggest that this young man has had and is likely to continue to have in the future significant academic difficulties and, therefore, needs, as well as qualifies for, an IEP to manage him on an individual and ongoing basis on what may well be a permanent regime of educational intervention.

TR 234-35.

On January 2, 1996, Plaintiff underwent an MRI of his brain the Childrens Hospital of Alabama. TR 233. Russell Cunningham, M.D., reviewed Plaintiff's MRI and compared the results with the results of an MRI that had been conducted on April 6, 1995. *Id.* Dr. Cunningham opined, "Since the previous study the probable thrombosis in the left internal

5

jugular vein at the level of the jugular foramen has cleared and is no longer present." *Id.* He also noted, "There are postoperative changes[5] involving the fourth ventricle without evidence of enhancing tumor remaining," and "No metastatic lesions." *Id* (footnote added). Dr. Cunningham observed that Plaintiff's "postoperative appearance of the fourth ventricle" and "prominence of the cerebellar folia" were "stable." *Id.* Dr. Cunningham also observed "Some slight muscosal thickening of the right sphenoid air cell ... as well as the ethmoid air cells bilaterally." *Id.* Dr. Cunningham's impressions were: "Evidence of mucosal thickening involving the ethmoid air cells and sphenoid sinus. Postoperative changes of the fourth ventricle which are stable. No evidence of residual or recurrent tumor. Clearing of left internal jugular vein thrombosis since prior study." *Id.*

On January 30, 1996, Dr. Cunningham again examined Plaintiff. TR 232. Dr. Cunningham recorded Plaintiff's weight and height, continued Plaintiff's medication of Protropin 1.8mg six times a week, and indicated that Plaintiff should return in 3 months. *Id.*

On May 7, 1996, Plaintiff was again examined by Dr. Cunningham. TR 231. Dr. Cunningham recorded Plaintiff's height and weight, continued Plaintiff's prescription of Protropin 1.8 mg six times a week, and indicated that Plaintiff should return in another 3 months. TR 231.

On August 8, 1996, Katrina L. Parker, M.D., examined Plaintiff at the University of Alabama, Birmingham, for a follow-up examination regarding his "growth hormone deficiency." TR. 229. Dr. Parker noted that Plaintiff had grown one inch and gained 4.2 pounds in the

---

[5]This record presumably refers to Plaintiff's surgery for his brain tumor, but the Administrative Record does not contain any medical records concerning that surgery. It appears that that surgery occurred in 1991, when Plaintiff was 9 years old. TR 174.

Case 1:05-cv-00033   Document 23   Filed 07/19/06   Page 6 of 37 PageID #: 73

previous 3 months. *Id.* Dr. Parker opined that Plaintiff's growth velocity was "adequate," and continued Plaintiff's dose of Protropin. *Id.* Dr. Parker conducted a bone age examination of Plaintiff, which revealed "normal left hand for bone age." TR 230.

On February 24, 1997, Patricia Aronin, M.D., of the Childrens Hospital of Alabama, Birmingham, ordered an MRI of Plaintiff's brain. TR. 226-27. Plaintiff's MRI revealed evidence of "atrophy of the right cerebellar hemisphere and resection of the inferior aspect of the cerebellar vermis, with a residual cavity representing the enlarged fourth ventricle and tumor bed site." TR 226. Dr. Aronin noted that "There was some increased signal along the right posterolateral aspect of the tumor bed site and near the left cerebellar tonsil and along the left posteromedial operative site," but observed that "this was unchanged compared to 1/2/96." *Id.* Dr. Aronin also reported, "There continues to be mild dilatation of the lateral and third ventricles that was unchanged compared to the previous exam." *Id.* She noted that "No white matter or basal ganglia abnormalities were appreciated" and that "no area of abnormal contrast enhancement was seen." *Id.* Dr. Aronin observed: "There was ethmoid and sphenoid sinus mucosal disease evident," but noted that "The previously suspected area of jugular vein thrombosis was not evident on this scan." *Id.* Dr. Aronin's impressions were: "Status post resection of posterior fossa medulloblastoma without evidence of residual or recurrent disease. Residual ventricular enlargement remains which is mild. Right cerebellar atrophy is currently stable. Sinus mucosal disease was evident." TR 227.

On May 20, 1997, Plaintiff saw Dr. Cunningham for a follow-up examination. TR 228. Dr. Cunningham recorded Plaintiff's height and weight, but made no recommendations, and indicated that Plaintiff should return in another 3 months. *Id.*

On February 6, 1998, Lloyd T. Shoop, Ed.S., and Robert S. Spangler, Ed.D., of Appalachian Psychological Consultants in Nashville, Tennessee, conducted a psycho/educational assessment for reevaluation of Plaintiff's placement in special education. TR 152-56. The report noted that Plaintiff's initial psycho/educational assessment had occurred in March 1995, and had resulted in a diagnosis of "Learning Disabled." TR 152.

The "Qualitative Observation" section of Plaintiff's reevaluation states in pertinent part as follows:

> Marshall is a Caucasian male who is of average developmental size and slender. He was clean, neat, and appropriately dressed for educational activities. The testing situation was adequate and rapport was established. Marshall was a cooperative test subject. Marshall reported that math is his favorite subject. In terms of vocational plans, he states that he would like to become a policeman.
>
> . . . A speech problem was not evident. Marshall did not show any difficulties that could be related to vision problems. No obvious sensory hearing difficulty was apparent. Age-appropriate skill with gross motor movements was observed. Age-appropriate skill with fine motor movements was observed. Marshall's general activity level was age and task appropriate. During this evaluation, his general interaction can be considered to be socially confident and comfortable. In terms of verbal interaction, Marshall showed little spontaneous speech. He frequently asked to have instructions repeated. His motivation was variable across tasks. Marshall's general approach to assessment tasks was variable across tasks. He preferred only easy items. Marshall's concentration on assessment tasks can be considered as erratic or variable concentration. He gave up too quickly. His FSIQ is an underestimate. His 'true' potential is closer to his 1995 FSIQ of 85 which will be used for all comparisons.

TR 152-53.

With regard to "Behavior Observation," the observer noted that Plaintiff "cannot express a complete thought in a sentence," "cannot copy correctly from the blackboard," "was quiet and

pleasant," and "seemed to be experiencing quite a lot of difficulty on all test items except Block Design." TR 153.

The evaluators noted a "discrepancy" between Plaintiff's "obtained Verbal and Performance Subscale IQ's." TR 153. They further noted that Plaintiff's "psychomotor functioning appears better than his verbal/cognitive functioning," that his "overall intelligence appears to be inconsistent," but that his "functioning in each area is consistent," that his visual motor perception was "adequate," that there were "no consistent indications of emotional difficulties," and that he "appears to be adjusting adequately to his environment." TR 153-54. Plaintiff's reevaluation concluded that his "Full Scale IQ places him in the intellectually deficient classification of overall intellectual functioning" (TR 153), and that he was eligible for a special program (TR 154).

On April 9, 1998, Dr. Parker conducted a follow-up examination of Plaintiff regarding his growth hormone deficiency. TR 224. Dr. Parker recorded Plaintiff's height and weight, sexual development, and thyroid function. *Id.* Dr. Parker noted that Plaintiff's physical examination was "remarkable for alopecia," but that he had "normal thyroid function," and normal bone age. *Id.* Dr. Parker noted that, because of Plaintiff's "inadequate growth velocity," she elected to increase his dose of Protropin to "1.9 mg subcu six days a week," and noted that Plaintiff should return in 3 months for another follow-up examination. *Id.*

On August 31, 1998, Plaintiff returned to Dr. Parker for a follow-up examination regarding his growth hormone deficiency. TR 223. Dr. Parker noted that Plaintiff had "tolerated his injections well," but that he "occasionally has headaches." *Id.* Dr. Parker reported "normal thyroid function tests," continued Plaintiff's growth hormone treatment, and reported that

9

Plaintiff should return in 3 months for another follow-up examination.  *Id.*

On November 19, 1998, Dr. Parker performed another follow-up examination regarding Plaintiff's growth hormone deficiency.  TR 221.  Dr. Parker recorded Plaintiff's parents' concern about the difficulties that Plaintiff was experiencing in school, and noted that she urged them to contact the school district for further testing and assistance.  *Id.*  Dr. Parker observed that Plaintiff had "grown inadequately over the preceding seven months," and she noted that if Plaintiff did not "grow adequately on the next visit, his [growth hormone] therapy will be discontinued."  *Id.*

On September 22, 1998, Dr. Parker wrote letter to Plaintiff's school notifying the school of Plaintiff's medical situation, and recommending special testing or assistance for Plaintiff, including "tutoring or one-on-one teaching."  TR 222.

On February 2, 1999, Victor V. Pouw, M.D., examined Plaintiff at the University of Alabama, Birmingham, for a follow-up of Plaintiff's growth hormone deficiency.  TR 220.  Dr. Pouw conducted a physical examination and reported no significant problems other than psoriasis of the toenails.  *Id.*  Dr. Pouw noted that Plaintiff's growth was marked at 1 inch per year, that Dr. Pouw had consulted with the Plaintiff and Plaintiff's family, and that Dr. Pouw would cease the growth hormone treatment.  *Id.*

On August 3, 1999, Hussein Abdul-Latif, M.D., performed a follow-up examination of Plaintiff regarding his growth hormone deficiency.  TR 216.  Dr. Abdul-Latif noted that Plaintiff's weight was unchanged from February 1999, and that he had grown .25 of an inch over the previous 6 months.  *Id.*  Plaintiff's physical examination revealed normal results, while a bone age examination demonstrated "advanced bone age."  *Id.,* TR 219.  Dr. Abdul-Latif

10

concluded, "With his bone age being so advanced, there is no point in restarting him on growth hormone, and we will just continue managing him the same way." TR 216. Dr. Abdul-Latif noted that Plaintiff was to return in 6 months for another follow-up examination. *Id.*

Also on August 3, 1999, Plaintiff underwent an MRI of his brain, which was compared with an MRI obtained on February 24, 1997. TR 217. Plaintiff's MRI revealed "a large defect in the posterior fossa in the midline, at the site of the medulloblastoma and a tongue-like projection of the cerebellar vermis/hemisphere projecting into the psuedo fourth ventricular cavity from the left cerebral hemisphere," but "no evidence for recurrent disease" and "no complications." *Id.*

On April 10, 2000, Plaintiff underwent an MRI of his brain ordered by Russell Berscheid, M.D., at Maury Regional Hospital. TR 162. Plaintiff's MRI revealed:

> 1. Postradiation change in right cerebellum.
>
> 2. Enlargement of left fourth ventricle, however no evidence of mass, abnormal enhancement, recurrent or residual tumor; no hydrocephalus.
>
> 3. Minimal sinus disease.

*Id.*

On April 12, 2000, C. Houston Jameson, M.D., conducted a follow-up examination of Plaintiff at Medical Oncology in Columbia, Tennessee. TR 160-61. Dr. Jameson reported that Plaintiff's examination was "unremarkable only as mentioned in the history above," and that "No laboratory work was performed at our office." TR 160-61. A previous MRI revealed "post radiation changes in the right cerebellum and an enlargement of the left fourth ventricle."[6] *Id.*

---

[6]The date of that MRI is unknown. Dr. Jameson, in an April 12, 2000, letter to Dr. Berscheid, simply states, "A MRI scan performed since your visit with him on 4 April showed post radiation changes in the right cerebellum and enlargement of the left fourth ventricle ...."

Dr. Jameson reported that there was "No evidence of mass, abnormal enhancement, or recurrent or residual tumor," and "no hydrocephalus." TR 161. Dr. Jameson recommended that Plaintiff return in 6 months for a follow-up examination and that his "MRI should be repeated in two years or if symptoms should develop." *Id.*

On September 28, 2001, Sean C. Kerby, M.D., of Maury Regional Hospital, ordered an MRI of Plaintiff's head, the results of which were compared with those of an MRI conducted on April 10, 2000. TR 170. Plaintiff's MRI revealed:

> 1. Postoperative and postradiation changes in the posterior fossa as described.
>
> 2. No evidence of recurrent or residual mass or enhancement.
>
> 3. Remaining examination is normal.

*Id.*

On October 1, 2001, Plaintiff visited Steven E. Woodley, M.D., at Medical Oncology in Columbia, Tennessee for his routine follow-up examination. TR 158. After conducting a physical examination, Dr. Woodley opined that Plaintiff was "clinically stable." *Id.* Dr. Woodley recommended that Plaintiff return in 1 year for another follow-up examination. *Id.*

On August 16, 2002, William A. Holland, M.D., examined Plaintiff on behalf of Tennessee Disability Determination Services. TR 172-74. Dr. Holland noted Plaintiff's reports that he "fatigues easily," that his "primary limitation" was a learning disability, that he was "quite weak," and that he had "difficulty lifting over 15 or 20 pounds." TR 172. Dr. Holland conducted a physical examination, which revealed that Plaintiff's grip strength was 3/5 bilaterally; all other findings were normal. TR 173. Dr. Holland concluded:

---

TR 160-61.

> At this time I would estimate he could work about 8 hours out of
> an 8 hour day but would need to be seated. He could stand or walk
> for 5 to 10 minutes per hour and should be able to ambulate to and
> from his work area several times per day without difficulty. He
> could lift, push or pull about 5 pounds occasionally, would be
> fairly low as well [*sic*].

TR 174.

On August 27, 2002, Thomas Pettigrew, Ed.D., conducted Plaintiff's psychological evaluation on behalf of Tennessee Disability Determination Services. TR 175-79. Dr. Pettigrew administered the following assessments: Wechsler Adult Intelligence Scale ("WAIS-III"), Wide Range Achievement Test ("WRAT3"), and Bender Gestalt Visual-Motor Test, and conducted a clinical interview and behavioral observation. TR 175. With regard to the results of his WAIS-III, Plaintiff's Verbal Scale IQ was 72, his Performance Scale IQ was 70, and his Full Scale IQ was 69. TR 177. Plaintiff's Full Scale IQ placed him in the range of Mild Mental Retardation (IQs 50-70). *Id.* Dr. Pettigrew noted that these scores "may, however, underestimate Plaintiff's intellectual potential." *Id.* Dr. Pettigrew also noted that Plaintiff "remained quite reticent during the psychological testing and considerable prompting and support were required to maintain his involvement." *Id.* Dr. Pettigrew added that Plaintiff's "response style appeared somewhat hesitant and ambivalence [*sic*]." *Id.* He noted that, when asked to define "assemble," Plaintiff repeated the question, paused and then responded, "to take something apart?," and that, when asked to define "yesterday," Plaintiff answered, "sometime you did the day after." *Id.*

With regard to the results of his WRAT3 Reading subtest, Plaintiff obtained a "raw score of 22," a "standard score of 50," and a "1st grade equivalency." TR 178. On the WRAT3 Arithmetic subtest, Plaintiff obtained a "raw score of 34," a "standard score of 80," and "a 6th grade equivalency." *Id.* Dr. Pettigrew noted that Plaintiff provided some "rather unusual

13

responses with considerable variability," reporting, "To the word even he responded 'any.'" *Id.*

Dr. Pettigrew also administered the Bender Gestalt Visual-Motor Test. TR 178. Plaintiff's results were, "essentially totally within normal limits." *Id.*

When asked to describe his activities of daily living, Plaintiff reported that he was "fully independent in meeting all of his personal needs including bathing, dressing and grooming," and that he helped "routinely with household work including washing dishes, doing laundry and 'some cooking.'" TR 178. Dr. Pettigrew also noted that Plaintiff reported regular social involvement with peers, spending the night away from home with friends, watching TV, and using a computer for "the Internet" and to "play games." *Id.* Dr. Pettigrew reported that when Plaintiff was asked about leisure activities Plaintiff said, "I like to collect knives and guns." TR 176. Dr. Pettigrew reported that Plaintiff claimed to have "about 12 guns," including "three 12 gauges, a .20, a .16 and some pistols." *Id.*

With regard to Plaintiff's functional assessment, Dr. Pettigrew opined:

> [Plaintiff] appears capable of understanding, remembering and carrying out at least simple verbal instructions. He appeared capable of adequate attention and concentration for tasks presented, however, initiative and persistence were limited. Although reticent throughout the interview, he demonstrated effective verbal and communication skills. He appears capable of recognizing and avoiding obvious environmental hazards as is also suggested by his use of firearms. Mr Russell is considered capable of managing disability funds.

TR 179.

On September 18, 2002, H. Frank Edwards, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff. TR 180-93. Dr. Edwards found that Plaintiff had "organic mental disorders" as evidenced by "memory impairment" and "cognitive disorder, NOS." TR 181. Dr. Edwards indicated that Plaintiff had a mild degree of limitation in his

14

"Restriction of Activities of Daily Living" and in his "Difficulties in Maintaining Social Functioning," but a moderate degree of limitation in his "Difficulties in Maintaining Concentration, Persistence, or Pace." TR 190. Dr. Edwards found that Plaintiff did not experience any degree of limitation with regard to "Episodes of Decompensation." *Id.* Dr. Edwards noted that Plaintiff "[g]ave opposite responses to definition of some words which seems contrived." TR 192.

Also on September 18, 2002, Dr. Edwards completed a Mental Residual Functional Capacity Assessment ("RFC") regarding Plaintiff. TR 194-96. Dr. Edwards indicated that Plaintiff was moderately limited in his abilities to: 1) maintain attention and concentration for extended periods, 2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, 3) respond appropriately to changes in the work setting, and 4) set realistic goals or make plans independently of others. TR. 194-95. Dr. Edwards also found that Plaintiff was markedly limited in his abilities to: 1) understand and remember detailed instructions, and 2) carry out detailed instructions. *Id.* In all other categories, Dr. Edwards indicated that Plaintiff was not significantly limited. *Id.* In his concluding remarks, Dr. Edwards noted that Plaintiff:

> Can understand, remember, and carry out simple instructions
>
> Can sustain attention and concentration for simple instructions
>
> Can keep to a schedule, maintain attendance, and complete a workweek while dealing with simple tasks
>
> Can work with and around others, to include the general public, without difficulty
>
> Can handle changes in work setting and set realistic goals without

15

significant emotional difficulty

TR 196.

On November 22, 2002, Plaintiff was examined at the Ardmore Family Medical Clinic,

for a wart on his left elbow and a flaking scalp. TR 269. He was also referred there for an MRI.

*Id.* The physician prescribed medication and lotion, and scheduled an MRI of Plaintiff's brain.[7]

*Id.*

On December 6, 2002, Deborah Verbeek, M.D., ordered an MRI of Plaintiff's brain,

which revealed "changes from previous surgery with encephall of the right cerebellar

hemisphere," but "no evidence of residual or recurrent tumor." TR 272.

On December 18, 2002, William Regan, M.D., completed a PRTF and a Mental RFC

Assessment regarding Plaintiff. TR 198-215. In his PRTF, Dr. Regan found that Plaintiff had

"organic mental disorders" as evidenced by "memory impairment" and "cognitive d/o NOS."

TR 199. Dr. Regan opined that Plaintiff had a mild degree of limitation in his "Restriction of

Activities of Daily Living" and in his "Difficulty in Maintaining Social Functioning," but had a

moderate degree of limitation in his "Difficulties in Maintaining Concentration, Persistence, or

Pace." TR 208.

In his Mental RFC Assessment, Dr. Regan found that Plaintiff was moderately limited in

his abilities to: 1) maintain attention and concentration for extended periods, 2) complete a

normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods, and

3) respond appropriately to changes in the work setting. TR 212-13. Dr. Regan further found

---

[7] The name of the treating physician is illegible. TR 269.

that Plaintiff was markedly limited in his abilities to: 1) understand and remember detailed instructions, 2) carry out detailed instructions, and 3) interact appropriately with the general public. *Id.* Dr. Regan noted that Plaintiff was not significantly limited in any other category. *Id.*

On February 11, 2003, Plaintiff was examined at the Ardmore Family Clinic for complaints of vomiting, cough, congestion, sore throat, and a runny nose. TR 265. The physician prescribed Nasacort, 2 sprays in each nostril BID for 2 days.[8] *Id.*

Also on February 11, 2003, John Worthman completed a Physical RFC Questionnaire regarding Plaintiff.[9] TR 253-56. The Questionnaire is blank with the following exceptions:

1. Frequency and length of contact:     yearly office visits
2. Diagnoses:           medulloblastoma
3. Prognosis:           guarded
6. Identify the clinical and objective signs: (see attached recent MRI)
>    This patient developed medulloblastoma at age 6, had a craniotomy followed by radiation therapy. He has developed short stature and has a small head for his age. He is permanently mentally challenged and requires assistance with many ADLs.

TR 253.

On February 26, 2003, Dr. Pettigrew conducted another psychological evaluation of Plaintiff. TR 236-42. Dr. Pettigrew administered the WAIS-III, Woodcock-Johnson Test of Achievement-Revised, Rorschach Technique, and House-Tree-Person Projective Technique, conducted a clinical interview and behavioral observation, and reviewed Plaintiff's application for vocational rehabilitation, school records, and psychoeducational assessment. TR 236.

---

[8] The physician's name is illegible. TR 265.

[9] John Worthman's credentials are unknown. The ALJ, in his decision, refers to him as "Mr. Worthman" (TR 17), while Plaintiff's Brief refers to him as Plaintiff's "treating oncologist" (Docket Entry No. 19-2).

17

With regard to the results of his WAIS-III, Plaintiff's Verbal IQ score was 77, his Performance IQ score was 80, and his Full Scale IQ score was 77. TR 239. Dr. Pettigrew noted that Plaintiff's WAIS-III scores "fell uniformly within the APA Borderline classification (IQ 71-84), but are thought to substantially underestimate his actual intellectual potential." TR 238.

With regard to the results of Plaintiff's Woodcock-Johnson Test of Achievement-Revised, Dr. Pettigrew stated, "Careful observation and analysis of specific responses to test items revealed evidence of significant variability and motivational inadequacy of sufficient magnitude to invalidate test results." TR 239. Dr. Pettigrew concluded: "In this examiner's professional opinion, results of the Woodcock-Johnson Test of Achievement-Revised are invalid." *Id.*

Dr. Pettigrew reported that Plaintiff's "responses to the Rorschach were too few to permit scoring." TR 238.

Dr. Pettigrew observed:

> His gait, balance, coordination and gross motor functioning appeared grossly normal to observation. He did not require the use of a cane, walker or other assistive device or orthopedic appliance. He entered the examination room silently and showed persistent reticence and reluctance to communicate throughout the evaluation. His affect was not dull. He was alert and oriented to time, place and person. While extremely reticent, his speech was clearly articulated without aphasia, dysarthria, thought preservation, confabulation, word finding deficits or other signs often associated with organic brain dysfunction.
>
> Profound and persistent passive-resistance was encountered throughout all phases of the examination. ... The examiner was impressed with the likelihood that unresolved issues related to his, thus far, unsuccessful pursuit of SSI Benefits significantly confounded results of psychological testing.

TR 238.

On June 23, 2003, Plaintiff was examined at the Ardmore Family Medical Clinic for

18

complaints of a wart on his elbow and of having to sleep with his mouth open "to breathe." TR 264. Plaintiff's wart was removed with cryosurgery, and Plaintiff was referred to "EN" for further testing.[10] *Id.*

On July 24, 2003, Lunette Harris of the Tennessee Rehabilitation Center at Columbia, examined Plaintiff to determine his vocational interests, strengths, potential, and limitations for future employment. TR 243-56. Ms. Harris reported that Plaintiff was able to tell time on 2 of 8 clocks shown, answer 6 of 8 questions relating to making change, and answer 0 of 16 measurement questions. TR 244. She further reported that Plaintiff was able to complete parts of a check writing exercise, but was unable to complete the deposit slip or check register. *Id.* Ms. Harris additionally reported that Plaintiff was able to complete the name, address, and telephone number portions of an application, but was unable to complete the other sections of the application. *Id.* She noted that Plaintiff was able to orally recite the days of the week and the months of the year, however, when he wrote them, Plaintiff listed the days of the week backward and misspelled most of them. *Id.* She noted that, in response to direct queries, Plaintiff answered that there were 12 hours in a day, 60 seconds in 1 minute, 306 days in a year, 12 minutes in 1 hour, and 4 weeks in 1 year. TR 244-25. She reported that Plaintiff also responded that Thanksgiving was celebrated in March, that Christmas was in December, and that Halloween was in "30." *Id.*

Based upon Plaintiff's abilities and interests, Ms. Harris indicated that the following jobs were "possible," but indicated that the list was "not all-inclusive:" Cook Helper (pastry), Baker Helper, Cook Helper (hotel/resort), Kitchen Helper, Food Assembler (kitchen), Silver Wrapper,

---

[10] The physician's name is illegible. TR 264.

19

Dining Room Attendant, Warehouse Worker, Packager (hand), Laundry Laborer, and Laundry Worker I. TR 246.

On August 11, 2003, John D. Alden, III, Ph.D., HSPP, performed Plaintiff's neuropsychological evaluation at Neuropsychology, Clinical & Consulting Psychology in Columbia, Tennessee. TR 257-60. Dr. Alden reported that Plaintiff's test results were "positive for generalized cognitive dysfunction," and that "he actually qualifies for a diagnosis of dementia secondary to a medical condition." TR 257. He noted that Plaintiff was "functioning below expected ranges in general intellectual capacity," "has objective evidence of limited intellectual verbal memory ability," "scores in the abnormal range" of "generalized cognitive dysfunction and verbal memory dysfunction," "has cognitive perseveration and proactive interference in rote and integrative verbal memory tasks, is unable to shift mental set quickly, and is unable to sustain attention on tasks." *Id.* Dr. Alden concluded that, given the length of time between the treatment of the brain tumor and the examination, it would be unlikely that Plaintiff would have significant improvement over his then-current cognitive and behavioral capacity. *Id.*

On November 18, 2003, Plaintiff was examined at the Ardmore Family Medical Clinic because he was experiencing chest pains, headaches twice a day, and a sore throat, and because his mother wanted him to receive a flu shot. TR 263. After a physical examination, the physician prescribed medication and administered a flu shot.[11] *Id.*

On December 4, 2003, Plaintiff was examined at the Ardmore Family Medical Clinic for complaints of diarrhea, fever, sore throat, and vomiting. TR 262. The physician prescribed

---

[11]The physician's name and the medication prescribed are illegible. TR 263.

fluids, rest and Tylenol.[12]  *Id.*

On January 26, 2004, Plaintiff was examined at Columbia Oncology for complaints of headaches.  TR 271.  The physician ordered a coulter laboratory test and prescribed medication for Plaintiff's headaches.[13]  *Id.*

On January 29, 2004, Plaintiff was examined at the Ardmore Family Medical Clinic for complaints of a sinus infection and occasional nausea.  TR 261.  The physician ordered an MRI of Plaintiff's brain and prescribed Puedomix 40mg.[14]  *Id.*

On February 25, 2004, Dr. Verbeek examined Plaintiff and ordered an MRI of his brain.  TR 270.  Dr. Verbeek noted that the MRI showed "changes from the previous surgery with encephalomalacia and volume loss in the right cerebellum," and "probable old thrombosed venous angioma in the right frontal lobe."  *Id.*

On March 25, 2004, Gregory A. Kersulis, M.D., examined Plaintiff for complaints of headaches 2 to 3 times per week that last several hours.  TR 278-79.  Dr. Kersulis conducted a physical examination and placed Plaintiff on Neurontin.  TR 279.

On April 22, 2004, Plaintiff was again examined by Dr. Kersulis for follow-up examination.  TR 277.  Dr. Kersulis noted that Plaintiff  reported that his headaches had completely disappeared  from the proscription of Neurontin 300mg po bid.  *Id.*

## B.  Plaintiff's Testimony

Plaintiff was born on May 25, 1984, and has a special education high school diploma.

---

[12]The physican's name is illegible.  TR 262.

[13]The physician's name and medication prescribed are illegible, and the results of the laboratory work do not appear in the Record.  TR. 271.

[14]The physician's name is illegible.  TR 261.

TR 297.  Plaintiff reported that he could read on a third or fourth grade level, but that he could not read and understand a newspaper or take a telephone message.  TR 298.  Plaintiff testified that he had taken a written test to get a driver's permit.  TR 299.  Plaintiff stated that he played baseball, but not through school, and he reported that being outside in the sun drained his energy.  TR 299-300.  Plaintiff stated that he had tried to ride a bicycle and skate, but was unable to do so because he would fall over.  *Id.*  Plaintiff testified that he could not type, but that he could use a computer to play games and use the internet, although he needed help installing the games onto the computer.  TR 300-02.

Plaintiff testified that he had worked at a restaurant filling salt shakers and ketchup bottles.  TR 302.  Plaintiff stated that he would work from 8:00 until 2:00 at the restaurant, but when asked how many hours that was, he answered "8."  TR 303.  Plaintiff noted that the work made him tired "after all the moving around."  *Id.*

Plaintiff testified that he helped his mother with household chores.  TR 303-04.  He stated that he cleaned tables, dusted, and vacuumed floors.  TR 304.  Plaintiff further testified that he could not wash clothes because he could not determine the amount of water to use or separate the colors from the whites.  *Id.*

Plaintiff testified that he had trouble "remembering things" and "remembering how to do things."  TR 305.  Plaintiff reported that if he did something every day he would not "forget so easily," but that if he only did the activity "like once and then every, another three weeks do it again, [he] would probably forget how to do it."  *Id.*  He reported that he could use a microwave to cook food, but not an oven, and added that he only knew how long to microwave the food that he really liked and regularly cooked.  *Id.*

Plaintiff testified that he had friends with whom he watched movies and played games.

22

TR 306.  Plaintiff testified that he usually spent his days "on the computer" or watching television.  *Id.*

Plaintiff testified that he would prefer to have a job so that he would not stay at home all day.  TR 307.  Plaintiff reported that he had spoken to the vocational rehabilitation office about job training, but that they had taken him to a job that required prolonged standing, which he reported that he was unable to do.  TR 306-07.

### C. Testimony of Josephine Russell, Plaintiff's Mother

Ms. Josephine Russell, Plaintiff's mother, also testified at Plaintiff's hearing.  TR 307. Ms. Russell testified that Plaintiff had trouble remembering "what goes in which drawer" in the kitchen in the home where they have lived since Plaintiff was young.  TR 308.  Ms. Russell reported that she would have to remind Plaintiff 2 or 3 times in the same day about things.  *Id.* Ms. Russell further stated that if Plaintiff knew how to do what he was asked, he would do it with no problems.  TR 309.  Ms. Russell stated that Plaintiff had trouble remembering multiple chores and that Plaintiff would have to ask about the next activity after he had completed the prior task.  *Id.*  Ms. Russell testified that Plaintiff had driven a car with his father on back roads, but that he could not navigate himself to cities surrounding his home.  TR 310.

Ms. Russell testified that, "before the surgery, [Plaintiff] was right handed," but continued, "after he had the surgery, he learned to write ... with his left hand."  TR 311.  She added that, as a result of the surgery, Plaintiff's hands were not steady.  *Id.*  Ms. Russell testified that Plaintiff would tire easily, and that Plaintiff would need to rest 2 or 3 times when moping the floor for 15 to 20 minutes before finishing the job.  TR 312.

Ms. Russell testified that she "sometimes" had to remind Plaintiff to do "personal things, like take a bath, brush his teeth," but that "sometimes" he would "remember to do it on his own."

23

TR 313.  She added that Plaintiff was "kind of shy" and "timid."  *Id.*

Ms. Russell stated that she preferred not leave Plaintiff home by himself during the day because she felt that Plaintiff was not capable of taking care of himself.  TR 314.  Ms. Russell added that she was not sure that Plaintiff would know what to do if the house caught on fire, despite being told many times.  *Id.*

Ms. Russell testified Plaintiff had friends who would come over to his house, and that Plaintiff would go over to friends' houses, but that he generally would not socialize in groups.  TR 316.  She added that Plaintiff would occasionally go to parties, go to the mall, or go to the movies.  *Id.*

Ms. Russell reported that, as a result of his surgery and subsequent radiation, Plaintiff's back and legs were weak.  TR 318.  She added that Plaintiff "had come out of surgery paralyzed" on his right side and that he had had to learn to walk again.  *Id.*

Ms. Russell stated that Plaintiff would sleep for several hours after school or if he had a headache.  TR 320-21.  She noted that Plaintiff would take naps 2 or 3 times per week, and that it would not "interfere with his sleeping at night."  TR 321.

Ms. Russell testified that, although they had applied for Social Security Disability, they had been "turned down" and she "never pursued it."  TR 321-22.

### D.  Vocational Testimony

Vocational Expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing.  TR 322.  The VE testified that she is a "certified rehabilitational counselor and certified vocational evaluation specialist," with a "private practice as a consultant."  TR 323.

The VE reported that Plaintiff was a "younger individual with a special education diploma from high school."  TR 323.  The VE noted that "There is some testing in the record that

24

indicates that he is illiterate," and she added that "he has no prior relevant work."  *Id.*

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff, and incorporating the "RSC in 4-F," and asked if the hypothetical claimant would be able to do any work in the State of Tennessee or the national economy.  TR 324.  The VE opined that, at the sedentary level, there were approximately 1,000 unskilled assembler jobs in the state economy and approximately 60,000 in the national economy; 300 inspecting jobs in the state economy and approximately 12,000 in the national economy; and 700 general laborer jobs in the state economy and approximately 34,000 in the national economy, all of which would be appropriate for the hypothetical claimant.  Id.

The ALJ then presented the VE with numerous modified hypothetical situations.  TR 324- 26.  The second hypothetical incorporated the findings of Dr. Pettigrew's August 27, 2002, Psychological Evaluation (TR 175-79).  TR 325.  The VE responded that this hypothetical claimant would have the same jobs available as the first hypothetical.  *Id.*

The third hypothetical incorporated the findings of Dr. Pettigrew's February 26, 2003, Psychological Evaluation (TR 236-42).  TR 325.  The VE responded that this hypothetical claimant would have the same jobs available as the previous hypotheticals.  *Id.*

The fourth hypothetical incorporated the findings of Dr. Edwards' September 18, 2002, PRTF (TR 180-93) and RFC (TR 194-96).  TR 325-26.  The VE answered that the previously identified available positions would remain available to this hypothetical claimant as well.  *Id.*

The fifth hypothetical posed by the ALJ incorporated the findings of Dr. Regan's December 18, 2002, PRTF (TR 198-211) and RFC (TR 212-15).  TR 326.  The VE answered that the same jobs would remain available.  TR 326.

The sixth hypothetical posed by the ALJ incorporated the findings of Ms. Harris' July 24,

25

2003, Vocational Evaluation Report (TR 243-56). TR 326. The VE answered that she did not have enough information to give an answer based on this report. *Id.*

The final hypothetical posed by the ALJ combined the findings of Ms. Harris' July 24, 2003, Vocational Evaluation Report (TR 243-56) with the findings of Dr. Pettigrew's February 26, 2003, Psychological Evaluation (TR 236-42). TR 326. The VE stated that the answer would be too difficult to determine. *Id.*

The VE testified that the evidence she provided did not conflict with the information in the Directory of Occupational Titles. TR 327. The VE testified that the ability to shift mentally from one concept or task to another would not make a difference in the ability to work, but that not being able to maintain attention to simple tasks would "certainly eliminate the ability to do work without special consideration during the supportive work setting." TR 328. The VE stated that if Plaintiff performed poorly on simple tasks that required sustained attention and concentration, "he would not have the ability to do those things." *Id.*

Plaintiff's attorney asked the VE to consider the effect on the stated available positions if Plaintiff "has a brain dysfunction that actually causes him to drift off into sleep periodically during the day." TR 329. The VE responded that the effect would depend on the frequency of occurrence or whether it interfered with normal work activity. *Id.* The VE testified that Plaintiff's difficulty with stamina would not interfere with the performance of the jobs listed. *Id.*

The VE reported that available sedentary general laborer positions included a "buckler and lacer," a "puller through," a "cuff folder," a "suture winder," a "thread separator," a "masker," and a "jewel stringer." TR 329-30. In response to the effect that an impairment in manual dexterity would have on the availability of the stated positions, the VE responded, "it would depend on the impairment." TR 330.

26

Plaintiff's attorney asked the VE what the effect would be on the availability of the stated positions if the ALJ should find that Plaintiff was "somewhat clumsy in the use of his hands," and was "unable to sustain a level of frequent hand use." TR 331. The VE responded that it would eliminate the identified positions. *Id.*

The ALJ, upon re-examination, posed an additional hypothetical to the VE incorporating the limitations contained in Dr. Holland's August 16, 2002, DDS consultative evaluation (TR 172-74). TR 335. The VE responded that that hypothetical claimant would not be able to do any work in the state or national economies. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*,

27

745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

28

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[15] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's

---

[15]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

29

disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ "misread" the evidence and inappropriately dismissed the findings of John Worthman and Dr. Alden, that the ALJ's decision contained numerous factual mistakes, and that the ALJ failed to consider all of the evidence in the record when evaluating Plaintiff's limitations. Docket Entry No.19-2. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and

immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a Plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171,

176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

Plaintiff contends that the ALJ "misread" the evidence and inappropriately dismissed the

findings of John Worthman and Dr. Alden.  Docket Entry No. 19-2.  With regard to the findings

of John Worthman, the ALJ stated as follows:

> The record contains an opinion by John Worthman dated February
> 11, 2003, indicating the claimant is permanently mentally
> challenged and requires assistance with many ADLs.  He indicated
> this opinion was based on "recent" MRI scanning; however,
> assuming the scan he is referring to is December 2002, this scan
> was unremarkable.  I have still considered this opinion, but I am
> unable to give it controlling weight in this decision as counsel has
> offered no evidence regarding Mr. Worthman's qualifications.
> Further, this opinion is not supported by objective medical findings
> and is inconsistent with the totality of the record.

TR 17 (citations omitted).

As an initial matter, Plaintiff takes issue with the ALJ's characterization of the December

2002 MRI as "unremarkable" (TR 17).  Docket Entry No. 19-2, p. 23.  Plaintiff argues that the

ALJ's assertion is "simply wrong."  *Id.*  Plaintiff's December 2002 MRI of the brain revealed the

following findings and impressions:

> FINDINGS:
> There are changes from previous surgery with encephall of the
> right cerebellar hemisphere.  There is *no evidence of residual or
> recurrent tumor.*  The ventricals are *normal in size and position*
> with *no hydrocephalua or mass affect.*  There are otherwise *no
> focal lesions* and *no evidence of intracranial hemorrhage.*  There
> are *no abnormal areas of contrast enhancement.*
>
> IMPRESSION:
> 1) Changes from previous surgery with encephalomalacia of the
> right cerebellar hemisphere.

2) *Otherwise, negative bain* [*sic*] *MRI.*

TR 272 (emphasis added).  Based upon the findings and impressions stated in the MRI, the

undersigned does not agree that the ALJ's characterization that Plaintiff's MRI was

"unremarkable" was erroneous.

Additionally, although Plaintiff, in his Brief, refers to John Worthman as Plaintiff's

"treating oncologist," there are no treatment notes in the Record from John Worthman regarding

Plaintiff.  In fact, the Record contains only *one* document from John Worthman.  *See* TR 253-56.

As has been noted, this single document is a Physical RFC Questionnaire dated February 11,

2003, that is blank with the following exceptions:

> 1.  Frequency and length of contact:          yearly office visits
> 2.  Diagnoses:          medulloblastoma
> 3.  Prognosis:          guarded
> 6.  Identify the clinical and objective signs: (see attached recent MRI)
>> This patient developed medulloblastoma at age 6, had a craniotomy followed by radiation therapy.  He has developed short stature and has a small head for his age.  He is permanently mentally challenged and requires assistance with many ADLs.

TR 253-56.  The document is signed by "John Worthman," but there is no indication of his title

or credentials, and there is nothing in the Record to support Plaintiff's assertion that John

Worthman is Plaintiff's "treating oncologist."

The Regulations do not require an ALJ to accord controlling weight to the conclusion

reached by one person whose credentials are unknown and whose opinion is expressed in one

incomplete Questionnaire that is conclusory and unsupported by the Record.  The ALJ in the

case at bar properly considered the Questionnaire submitted by John Worthman and discussed

her reasons for according the opinions expressed therein little weight.

Plaintiff's arguments that the ALJ "misread" the evidence and inappropriately dismissed the findings of John Worthman fail.

Plaintiff also argues that "The ALJ's dismissal of Dr. Alden's findings reflects a total misreading of his report." Docket Entry No. 19-2, p. 24. With regard to Dr. Alden, the ALJ stated as follows:

> Counsel referred the claimant for a neuropsychological evaluation on August 11, 2003, by John Dale Allen [*sic*], III, Ph.D., who determined Mr. Russell was functioning below expected ranges of general intellectual capacity when compared to others of his age cohort. WAIS-III testing indicated he functioned in the borderline dysfunctional range. Regarding memory functioning, he was able to recall 3 of 3 words immediately; 3 of 3 at 3 minutes; and 2 of 3 at 15 minutes. No evidence of clinically significant depression or other psychological difficulty that would be considered to be of sufficient severity to account for the cognitive problems were reported. No diagnostic impression was offered.

TR 16 (citations omitted). Plaintiff particularly takes issue with the ALJ's statements "No evidence of clinically significant depression or other psychological difficulty that would be considered to be of sufficient severity to account for the cognitive problems were reported," and "No diagnostic impression was offered." Docket Entry No. 19-2, p. 24.

Plaintiff argues, "Dr. Alden stated that no depression or other psychological difficulty accounted for the cognitive problems *in order to rule out depression as the cause of those problems. He concluded that organic brain injury was the cause*." Docket Entry No. 19-2, p. 24 (emphasis added). Dr. Alden's report states in pertinent part as follows:

> Mr. Russell has no evidence of or history of clinically significant depression or other psychological difficulty that would be considered to be of sufficient severity to account for the cognitive problems reported by the patient and found on formal testing. Given his medical history and current results, it *is most likely* that he is experiencing cognitive difficulty due to the original tumor as well as from the treatment for it.

33

TR 257 (emphasis added). Although Plaintiff speculates as to the reason for Dr. Alden's conclusions, Dr. Alden, in his report, does not indicate that he proffered the above-quoted opinion "in order to rule out depression as the cause of those problems." Moreover, Dr. Alden does not conclude that "organic brain injury was the cause." Dr. Alden very clearly qualifies that "it is most likely" that Plaintiff's cognitive difficulty was due to the original tumor and resulting treatment. Despite Plaintiff's assertions, the ALJ's statement that, "No evidence of clinically significant depression or other psychological difficulty that would be considered to be of sufficient severity to account for the cognitive problems were reported," is an accurate reading of Dr. Alden's report. Plaintiff's argument on this point fails.

With regard to Plaintiff's argument that the ALJ misread Dr. Alden's findings by declaring that "No diagnostic impression was offered" (TR 16), the ALJ's statement, is, technically correct, as Dr. Alden did not offer a specific "diagnostic impression" in his report. *See* TR 257. Dr. Alden's report does, however, contain a section entitled "IMPRESSION" which begins, "These results are positive for generalized cognitive dysfunction, and he actually qualifies for a diagnosis of dementia secondary to a medical condition," and concludes, "Given the length of time since his diagnosis and treatment of brain tumor, it is highly unlikely that he will have significant improvement over his current cognitive and behavioral capacity." *Id.* Although not specifically "diagnostic impressions," Plaintiff could reasonably interpret Dr. Alden's statements as such. Even if Dr. Alden's statements were "diagnostic impressions" so as to make the ALJ's statement that "No diagnostic impression was offered" erroneous, this error would be harmless, as the ALJ did not base her conclusion that Plaintiff was not disabled solely upon her finding that Dr. Alden's report did not offer a diagnostic impression.

Plaintiff additionally argues that the ALJ's statement: "Repeat MRI scanning of the brain

indicates no significant abnormalities" (TR 15) is "simply wrong." Docket Entry No. 19-2, p. 23. Plaintiff argues, "Every MRI scan done has shown the residuals of the tumor resection and the subsequent radiation." *Id.* While Plaintiff is correct that the MRI's note his previous surgery, his MRI's also consistently note, *inter alia*, that there was no evidence of residual or recurrent tumor or disease, that his condition was "stable," and that his then-current scans were generally unchanged from his previous scans.[16] *See, e.g.,* TR 233, 277, 217, 162, 161, 170. Accordingly, the undersigned does not find the ALJ's statement, "Repeat MRI scanning of the brain indicates no significant abnormalities" (TR 15), to be an erroneous characterization, and Plaintiff's argument on this point fails.

Plaintiff also argues that the ALJ erroneously found that Plaintiff had a "high school education," because he had only a special education diploma. Docket Entry No. 19-2, p. 25. While it is true that the ALJ, in his "Findings" indicated, "The claimant has a 'high school education' (20 CFR 404.1564 and 416.964)" (TR 20), this is a proper statutory classification, and not reversible error. When recounting Plaintiff's testimony, the ALJ, in his decision, specifically noted: "Mr. Russell said he has a learning disability and graduated high school at age 20, with a special education diploma." TR 16-17. The ALJ was aware that Plaintiff

---

[16]Additionally, the ALJ, in her decision, specifically acknowledged Plaintiff's original condition and subsequent treatment, stating: "A review of the medical evidence indicates that the claimant developed headaches at age 6 and was found to have medulloblastoma, resulting in a craniotomy with tumor resection followed up by radiation therapy." TR 15. The ALJ further found that Plaintiff's "remote history of medulloblastoma and status-post craniotomy with radiation therapy" were severe impairments (TR 16) and she took Plaintiff's cognitive and learning difficulties into account in her RFC determination when she acknowledged Plaintiff's limited initiative and persistence, and when she limited Plaintiff to jobs that contained only simple instructions (TR 18). Accordingly, it is clear that the ALJ did not simply dismiss Plaintiff's assertions that he suffered from residual effects of the surgery and subsequent treatment.

35

graduated from high school with a special education diploma, and Plaintiff's argument on this point is meritless.

Plaintiff further maintains that the ALJ erroneously stated that Dr. Pettigrew indicated that Plaintiff reported that he "routinely assisted" with household chores. Docket Entry No. 19-2. Despite Plaintiff's assertions, Dr. Pettigrew did, in fact, indicate: "He reported that he assists *routinely* with household work including washing dishes, doing laundry and 'some cooking.'" TR 178 (emphasis added). The ALJ accurately recounted Dr. Pettigrew's findings; Plaintiff's argument fails.

Plaintiff finally contends that the ALJ failed to properly evaluate the combined effect of his impairments. Docket Entry No.19-2. Specifically, Plaintiff argues that the ALJ failed to give proper weight to testing done when Plaintiff was a child and still in school, to a vocational evaluation done by the state, and a report from Plaintiff's special education teacher of four years. *Id.*, p. 26.

Plaintiff correctly asserts that the ALJ must evaluate the combined effect of his impairments. 42 U.S.C. § 423(d)(2)(B). Plaintiff, however, fails to show that the ALJ did not do so. Instead, Plaintiff maintains that "the ALJ simply ignored" the sources that describe the "severe limitations" in his functioning. Docket Entry No. 19-2, p. 26.

Contrary to Plaintiff's assertions, the ALJ's decision discusses the medical and testimonial evidence of record in great detail, including Plaintiff's surgery, subsequent treatment, and its resulting effects. TR 13-21. Moreover, the ALJ specifically discusses Plaintiff's mental limitations and learning disabilities. *Id.* The ALJ, after evaluating all of the medical, vocational, and testimonial evidence, however, determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. TR 21. It is clear from the ALJ's

articulated rationale that the ALJ considered the record as a whole in evaluating the combined effect of Plaintiff's impairments; Plaintiff's argument fails.

There is substantial evidence in the record to support the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing; the ALJ's decision, therefore, must stand.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).


_____
E. CLIFTON KNOWLES
United States Magistrate Judge